IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
_____ DIVISION

| | |
|---|---|
| HANOVER INSURANCE COMPANY) <br> ) <br> ) <br>      Plaintiff,      ) <br> v.      ) <br>      ) <br> FLORIDA COALITION AGAINST) <br> DOMESTIC VIOLENCE, INC., a) <br> Florida not-for-profit corporation;) <br> FLORIDA COALITION AGAINST) <br> DOMESTIC VIOLENCE) <br> FOUNDATION, INC., a Florida    ) <br> not-for-profit corporation; TIFFANY) <br> CARR; SANDRA BARNETT;) <br> PATRICIA DUARTE; MELODY) <br> KEETH; LAUREL LYNCH;) <br> ANGELA DIAZ-VIDAILLET;) <br> SHANDRA RIFFEY; DONNA) <br> FAGAN; THERESA BEACHY;) <br> SHERYL SCHWAB; LORNA) <br> TAYLOR; and PENNY MORRILL, ) <br> <br>      Defendants. <br> _____/ | Civil Action No.: |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Hanover Insurance Company ("Hanover"), files its Complaint for Declaratory

Judgment against Defendants Florida Coalition Against Domestic Violence, Inc. ("FCADV"),

Florida Coalition Against Domestic Violence Foundation, Inc. ("FCADVF"), Tiffany Carr,

Sandra Barnett, Patricia Duarte, Melody Keeth, Laurel Lynch, Angela Diaz-Vidaillet, Shandra

Riffey, Donna Fagan, Theresa Beachy, Sheryl Schwab, Lorna Taylor, and Penny Morrill (collectively, the "INSUREDS"), and alleges as follows:

## I.   INTRODUCTION

1.     This is an insurance coverage dispute between Hanover and the INSUREDS, based on several Hanover Policy exclusions, as well as the INSUREDS' misrepresentations in the Policy Application.  The Hanover Policy at issue in this Coverage Lawsuit – a Nonprofit D&O Policy, has an inception date of December 19, 2019, and was the _first policy Hanover ever issued to FCADV_.

2.     FCADV is a Florida not-for-profit corporation and pursuant to two Grant Contracts, FCADV received tens of millions of dollars in federal and state grant monies to help victims of domestic violence.  However, _from July 1, 2016 through October 2019_, the Florida Attorney General alleges FCADV, its CEO (Tiffany Carr), and other officers "engaged in a pattern of serious misconduct and abuse," which included "the diversion of significant funding to enrich its officers to a shocking degree – including $7.5 million to its CEO, Defendants Tiffany Carr, over a three-year period."   (_See_, AG Lawsuit; Florida Attorney General's Emergency Motion to Appoint a Receiver.)  This alleged misappropriation of at least $7.5 million has resulted in two lawsuits by Florida state agencies against the INSUREDS – the first filed by the Florida Department of Children and Families ("DCF") (the "DCF Lawsuit"), and the second filed by Florida Attorney General (the "AG Lawsuit") (collectively, the "State Litigation"). The INSUREDS seek coverage under the Hanover Policy for the State Litigation, and Hanover presently seeks a declaratory judgment that it has no obligation to defend or indemnify the INSUREDS for the State Litigation.

3.      Specifically, on July 26, 2018, the *Miami Herald* published a news article headlined, "**Nonprofit? She gets paid $761,560 to run this domestic violence group**," and the article stated FCADV's CEO Carr "is paid $761,560 annually, a salary that is approved by its board." A month after this story, on August 27, 2018, the DCF began "investigat[ing] FCADV's administrative costs and *executive compensation*"; however, over the course of the next two years, "FCADV...stonewall[ed] that investigation" (the "DCF Investigation").

4.      In particular, during the DCF Investigation of FCADV, *from August 27, 2018 until February 11, 2020*, the DCF made no less than *six written demands for documents* and information related to FCADV's executive's compensation, but instead of FCADV responding truthfully, the DCF alleges it "was provided false and incomplete documents, data, information and spreadsheets that obscured the true amounts of executive compensation received by" FCADV executives.

5.      Hanover has numerous coverage defenses that bar coverage for the entirety of the State Litigation. *First*, as noted above, on August 27, 2018, the DCF Investigation commenced its examination of executive compensation at FCADV – this investigation began more than two years *before* the inception date of Hanover's first Policy (*i.e.*, December 19, 2019). To prevent providing coverage for a "burning building" (*e.g.*, like here, the DCF Investigation), Hanover's Policy contains a Prior & Pending Litigation/Demand Exclusion which expressly states, "[t]his insurance does not apply to **Loss** for any **Claim** [*i.e.*, the State Litigation]:...[b]ased upon, arising out of or in any way related to any...litigation...or...*written demand* pending against any **Insured**...prior to [December 19, 2019]." (Emphasis added.)

6.     Here, based on the provisions of two DCF-FCADV Contracts (*i.e.*, Contract LN967 and Contract LJ990),[1] DCF made no less than *five written demands* to FCADV for it to produce documents and provide information on executive compensation at FCADV. Specifically, under Section 25.c. of Contract LN967, and Section 5.1.1 of Contract LJ990, these Contractual Provisions state "[u]pon *demand*," FCADV was obligated to produce records or documents to DCF.  Based on these two Contracts, the DCF Lawsuit alleges that DCF "*made repeated and multiple demands* for production of documents reflecting the income and expenditure of funds provided by DCF."  (DCF Lawsuit, ¶48.f.)  Indeed, *before* the Hanover exclusion's December 19, 2019 date, DCF made no less than *five "written demands"* to FCADV for it to produce documents and information related to FCADV executive's compensation. Accordingly, because the State Litigation is "based upon, arising out of or in any way related to" DCF's five written demands before December 19, 2019, the Prior & Pending Litigation/ Demand Exclusion bars coverage for the State Litigation.

7.     *Second*, on February 12, 2020, the INSUREDS executed and submitted a Policy Application for insurance with Hanover (the *first* insurance policy with Hanover) in which the INSUREDS were expressly asked if they were "aware of any fact, circumstance, or situation that might reasonably be expected to result in a Claim," and incredibly, despite *the five prior written demands for documents related to the DCF Investigation*, and INSUREDS answered "No" to this question.  Immediately following this question, the Policy Application states:

> **IMPORTANT**: Without prejudice to any other rights and remedies of the **Insurer**, the Applicant understands and agrees that *if any such fact, circumstance or situation exists, whether or not disclosed in response to the question above,*

---

[1] *See*, DCF Lawsuit, ¶47 ("DCF and FCADV had, and continue to have, a valid and enforceable contract.")

> *any claim or action arising from such fact, circumstance or situation is excluded from coverage under the proposed policy*, if issued by the **Insurer**. [Hereinafter, the "Policy Application Claim Exclusion"] (Emphasis added.)

Given the INSUREDS were most certainly aware of "any such fact, circumstance or situation" – *i.e.*, the DCF Investigation and the five demand letters directed to FCADV seeking documents and information related to the improperly used grants monies, the Policy Application Claim Exclusion bars coverage for the State Litigation.

8.     *Third*, in addition to the Policy Application exclusion, the Policy itself bars coverage for any misrepresentation in the Policy Application for any **Insured** "who knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations)" (the "Policy Claim Exclusion").  Given the DCF Investigation and the five demand letters directed to FCADV, the Policy Application Claim Exclusion bars coverage for the State Litigation.

9.     *Fourth*, Hanover's Policy contains other terms, conditions, and exclusions that bar coverage for all or some of the State Litigation, including: the Fraud Exclusion, the Profit Exclusion, the Contract Exclusion, and the provision excluding amounts deemed uninsurable by law, which applies because restitution and/or return of ill-gotten gains is not insurable under Florida law.   In addition, under the Known Loss Doctrine, Hanover has no obligation to defend or indemnify the INSUREDS for the State Litigation.

10.     Presently, Hanover has agreed to defend the INSUREDS subject to: (i) an express reservation of rights that Hanover would be filing a Coverage Lawsuit and seeking a declaratory judgment that it has no obligation to defend and/or to indemnify under the Policy;

and (ii) if so determined, pursuant to Florida law, Hanover will seek reimbursement of all fees, costs, and expenses paid on behalf of each of the INSUREDS.

11.     An actual controversy exists between the INSUREDS and Hanover regarding Hanover's purported obligation to provide the INSUREDS with insurance coverage for the State Litigation, and this controversy cannot be resolved without a declaration of the rights and responsibilities of the parties by this Court.

## II. **PARTIES**

12.     Plaintiff Hanover is a company incorporated under the laws of New Hampshire with its principal place of business at 440 Lincoln Street, Worcester, Massachusetts.

13.     Defendant FCADV is a Florida not-for-profit corporation, organized under Florida law, with its principal place of business at 425 Office Plaza Drive, Tallahassee, Florida.

14.     Defendant FCADVF is a Florida not-for-profit corporation, organized under Florida law, with its principal place of business at 425 Office Plaza Drive, Tallahassee, Florida.

15.     Defendant Tiffany Carr is a citizen of Florida.

16.     Defendant Sandra Barnett is a citizen of Florida.

17.     Defendant Patricia Duarte is a citizen of Florida.

18.     Defendant Melody Keeth is a citizen of Florida.

19.     Defendant Laurel Lynch is a citizen of Florida.

20.     Defendant Angela Diaz-Vidaillet is a citizen of Florida.

21.     Defendant Shandra Riffey is a citizen of Florida.

22.     Defendant Donna Fagan is a citizen of Florida.

23.     Defendant Theresa Beachy is a citizen of Florida.

24.     Defendant Sheryl Schwab is a citizen of Florida.

25.     Defendant Lorna Taylor is a citizen of Florida.

### III.  JURISDICTION AND VENUE

26.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 respecting diversity jurisdiction insofar as it involves citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs, as the INSUREDS are alleged to owe in excess of $7.5 million in improper compensation to federal and state agencies.  The INSUREDS are seeking at least this amount for indemnity from Hanover.

27.     Venue is appropriate under 28 U.S.C. § 1391 because a substantial part of the relevant events occurred in this District, including the issuance of the Policy to FCADV, and FCADV does business and has a principal office within this District, and the State Litigation are both filed within this District (in the Circuit Court of the Second Judicial Circuit, Leon County, Florida).

### IV.  BACKGROUND FACTS

**A.     The Hanover Policy**

**1.     The Hanover Application**

28.     On February 11, 2020, the INSUREDS executed and submitted a Policy Application to Hanover.

29.     Section XI of the Policy Application ("**PRIOR KNOWLEDGE AND APPLICANT REPRESENTATION**") provides:

Is any **Insured** proposed for coverage aware of any fact, circumstance, or situation that might reasonably be expected to result in a **Claim** that would fall within the scope of the proposed **Liability Coverage Parts**?

Yes ☐      No ☑

*If "Yes" please attach a full description of the details.*

This representation applies only to those coverage types for which no coverage is currently maintained and any larger limits of liability requested.

**IMPORTANT**: Without prejudice to any other rights and remedies of the **Insurer**, the Applicant understand and agrees that if any such fact, circumstance or situation exists, whether or not disclosed in response to the question above, any claim or action arising from such fact, circumstance or situation is excluded from coverage under the proposed policy, if issued by the **Insurer**. [Hereinafter, the "Application Claim Exclusion"]

30.     The INSUREDS answered "No" to the questions in Section XI.

31.     At the time of this representation, the INSUREDS had no coverage maintained with Hanover and were seeking $3 million in coverage from Hanover.

**2.      The Terms and Conditions of the Hanover Policy**

32.     Hanover issued to FCADV a Nonprofit Entity Advantage Policy, policy number LHJ-H138435-00, with a Policy Period from December 19, 2019 to December 19, 2020 ("the Policy").

33.     A true and correct copy of the Policy (which includes as part of the Policy, the Policy Application (referenced above)) is attached as Exhibit 1.

34.     The Insuring Agreements of the Directors & Officers and Entity Liability Coverage Part ("D&O Coverage") are at Section I of the Policy, and provide:

**I. Insuring Agreements**

A. <u>Individual Non-Indemnified Liability</u>

The **Insurer** will pay on behalf of each **Insured Individual**, **Loss** which the **Insured Individual** is legally obligated to pay due to a **Claim** first made against the **Insured Individual** during the **Policy Period**, or the Extended Reporting Period if applicable, except for **Loss** which the **Insured Entity** pays to or on behalf of the **Insured Individual** as indemnification.

B. <u>Individual Indemnified Liability</u>

The **Insurer** will pay on behalf of the **Insured Entity**, **Loss** which the **Insured Individual** is legally obligated to pay due to a **Claim** first made against the **Insured Individual** during the **Policy Period**, or the Extended Reporting Period if applicable, but only to the extent the **Insured Entity** indemnifies the **Insured Individual** for such **Loss**.

C. <u>Entity Liability</u>

The **Insurer** will pay on behalf of an **Insured Entity**, **Loss** which the **Insured Entity** is legally obligated to pay due to a **Claim** first made against the **Insured Entity** during the **Policy Period**, or the Extended Reporting Period if applicable.

35.     Section III of the D&O Coverage of the Policy contains the following definitions of "**Claim**": "[w]ritten demand received by an **Insured** for monetary or non-monetary relief including injunctive relief," or "[c]ivil proceeding commenced by the service of a complaint or similar pleading".

36.     Section III of the D&O Coverage of the Policy contains the following definition of "**Loss**":

Loss means **Defense Expenses** and the amount the **Insured** is legally obligated to pay as a result of a **Claim** including:

A. Monetary judgments, awards or settlements, pre-judgment and post-judgment interest and compensatory damages;

37.    Section III of the D&O Coverage of the Policy provides in part that **Loss** does not include any amount deemed uninsurable by law.

38.    Section III of the Common Policy Terms and Conditions ("Terms & Conditions") of the Policy contains following definition of "**Related Claims**":

> **Related Claims** means all **Claims** based upon, arising from or in any way related to the same facts, circumstances, situations, transactions, results, damages or events or the same series of facts, circumstances, situations, transactions, results, damages, or events.

39.    Section IV of the Terms and Conditions of the Policy provides:

**RELATED CLAIMS**

> With respect to the **Liability Coverage Parts** all **Related Claims** will be considered as a single **Claim** made in the **Policy Period** or Extended Reporting Period in which the earliest of such **Related Claims** was first made or first deemed to have been made pursuant to the applicable Coverage Part. All **Related Claims** are subject to the Limits of Liability, Retention and other terms and conditions applicable to the earliest **Related Claim**.

40.    Section IV of the D&O Coverage of the Policy contains the following Exclusion, which provides in part:

> A. Exclusions Applicable to All Insuring Agreements

> This insurance does not apply to **Loss** for any **Claim**:…2. Based upon, arising out of or in any way related to any litigation, administrative or arbitration proceeding, written demand pending against any **Insured**, or any order, decree or judgment entered prior to or on the Prior & Pending Proceedings Date set forth in Item 5. of the D&O Declarations.

41.    Section IV of the D&O Coverage of the Policy contains the following Exclusions, which states in part:

> A. Exclusions Applicable to All Insuring Agreements

> This insurance does not apply to **Loss** for any **Claim**:…3. Based upon, arising out of or in any way related to:

a. Any deliberate, dishonest, fraudulent act or omission, or willful violation of any statute or regulation by an **Insured**; or

b. An **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

However, this exclusion shall not apply to **Defense Expenses** unless and until a final, non-appealable judgment or adjudication in any underlying proceeding or action establishes that an **Insured** committed such an act or omission, violation of statute or regulation or gained such profit, remuneration or advantage to which the **Insured** was not legally entitled.

42.    Section IV of the D&O Coverage of the Policy contains the following Exclusion:

B. Exclusions Applicable to Insuring Agreement C. Corporate Entity Liability, Only

This insurance does not apply to **Loss** for any **Claim**:

1. Based upon, arising out of or in any way related to liability assumed through, or on account of, any oral or written contract or agreement to which an **Insured** is a party, however this exclusion shall not apply to liability that would have attached in the absence of such contract or agreement.

43.    Section IV of the D&O Coverage of the Policy contains the following Exclusion:

If the **Application** contains any misrepresentations made with the intent to deceive or contains misrepresentations which materially affect the acceptance of the risk or the hazard assumed by the **Insurer** under this Policy, then no coverage shall be afforded for any **Claim** based upon, arising from, or in consequence of, any such misrepresentation with respect to:

1. Any **Insured Individual** who knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations) or any **Insured Entity** to the extent it indemnifies any such **Insured Individual**; or

2. Any **Insured Entity** if any past or present chief executive officer, chief financial officer or chief information officer (or any equivalent position) of the **Insured Entity** knew of such misrepresentation (whether or not such individual knew such **Application** contained such misrepresentations).

B.     **The State Litigation**

1.     **The DCF Lawsuit**

44.     On or about March 4, 2020, DCF filed the DCF Lawsuit against the INSUREDS.

45.     A true and correct copy of the DCF Lawsuit is attached as Exhibit 2.

46.     A true and correct copy of Exhibit A to the DCF Lawsuit is attached as Exhibit 3.

47.     A true and correct copy of Exhibit B to the DCF Lawsuit is attached as Exhibit 4.

48.     On July 26, 2018, the *Tampa Bay Times* ran a news article headlined, "**Nonprofit? She gets paid $761,560 to run this domestic violence group**," which stated FCADV's CEO Carr "is paid $761,560 annually, a salary that is approved by its board."

49.     A true and correct copy of the *Miami Herald* article is attached as Exhibit 5.

50.     Less than a month after the *Miami Herald* article, DCF commenced an investigation into executive compensation at FCADV, including Carr and other executive's egregious salaries at FCADV.

51.     At paragraph 24, the DCF Lawsuit alleges that on August 27, 2018, DCF sent a letter to FCADV "notifying FCADV that DCF Office of the Inspector General (OIG) was initiating an investigation of FCADV's administrative costs and executive compensation."

52.     At paragraph 24, the DCF Lawsuit alleges that the "letter included a request for documentation for fiscal years 2016-2017 and 2017-2018, with a production deadline of September 5, 2018."

53.     The August 27, 2018 DCF letter states: "Section 20.055(6)(c), Florida Statutes, the Inspector General and his staff shall have access to any records, data, and other information deemed necessary to complete this project."

54.    The DCF Lawsuit alleges that DCF requested the documents to assist DCF to:

● Determine the proportion of Department funding expended by FCADV on administrative costs and executive compensation; and

● Determine whether funding expended on executive compensation agrees with information provided to the Department.

55.    A true and correct copy of DCF's August 27, 2018 letter to Tiffany Carr at FCADV is attached as Exhibit 6.

56.    By email dated August 31, 2018, DCF confirmed its August 27 requests with FCADV's counsel and reiterating it demand production of "all the Public Records" by the close of business on "Wednesday, September 5."

57.    A true and correct copy of DCF's email, dated August 31, 2018 and directed to FCADV's counsel, is attached as Exhibit 7.

58.    At paragraph 25, the DCF Lawsuit alleges the FCADV's response to DCF's August 27, 2018 document requests "satisf[ied] a small portion of DCF's request for production of documents."

59.    On January 31, 2019, DCF sent another letter to FCADV and advising that it "had failed to produce all documents specified in the August 2018 letter."

60.    At paragraph 26, The DCF Lawsuit alleges that on January 31, 2019 DCF letter "requested compliance with the subject request for production of documents by February 14, 2019."

61.    The January 31, 2019 DCF letter states, "many of the documents and records requested in the August 27, 2018 letter were not provided, nor have they subsequently been provided."

62.    The January 31, 2019 DCF letter states, "we have attached a list of documents and records that were not provided to the OIG and we request that FCADV provide them to us **no later than February 14, 2019**." (Emphasis in original.)

63.    A true and correct copy of DCF's January 31, 2019 letter to Tiffany Carr at FCADV is attached as Exhibit 8.

64.    At paragraph 27, the DCF Lawsuit alleges in FCADV's response to DCF's January 31, 2019, FCADV "asserted that executive compensation was not pertinent to FCADV's contract with the Department, and that FCADV refused to produce any documents relative to same."

65.    At paragraph 28, the DCF Lawsuit alleges on September 11, 2019, DCF sent another letter to FCADV "advising that the documents requested in the August 2018 letter had still not been produced, and documents provided by FCADV were not responsive to the request for specific documentation. FCADV was again asked to provide the remaining documents, this time by September 27, 2019."

66.    The September 11, 2019 DCF letter states, "many of the documents and records requested in the August 27, 2018 letter were not provided and we sent Ms. Carr a follow-up request, dated January 31, 2019."

67.    The September 11, 2019 DCF Letter states the FCADV "did not provide the total compensation amounts, including supporting documentation and sources of funding for FCADV officers, including Ms. Carr."

68.    The September 11, 2019 DCF letter states:

According to Section 20.055(6)(c), Florida Statutes, the Inspector General and his staff shall have access to any records, data, and other information deemed necessary to complete this project.

Under Section 25.g. of Department contract no. LN967, FCADV shall comply and cooperate immediately with any inspections, reviews, investigations or audits deemed necessary by the OIG. Section 25.h. of contract no. LN967, as revised in section D.18. of Attachment I, adds that no record may be withheld based on any claim that any record is exempt from public inspection or is confidential.

To date, FCADV has not provided any additional documents and records. Therefore, we have attached Schedule "A," which details the documents and records that were not provided to the OIG and **we request that the FCADV Board of Directors provide them to us by September 27, 2019.** (Bold in original.)

69.    A true and correct copy of DCF's September 11, 2019 letter to the FCADV board of directors is attached as Exhibit 9.

70.    At paragraph 29, the DCF Lawsuit alleges in FCADV's response to DCF's September 11, 2019 letter, FCADV claimed "that FCADV is only required to provide documents pertinent to the Contracts, and funding provided under the Contracts," and then the letter addressed Carr's salary and bonuses with certain document disclosures, but "[n]ot only were those disclosures false, but, notably, FCADV misleadingly referenced Ms. Carr's 'base salary,' while omitting any information regarding Ms. Carr's paid time off ('PTO'), for which she repeatedly received millions of dollars in cash payouts."

71.    At paragraph 29, the DCF Lawsuit alleges on November 7, 2019, DCF's Office of the General Counsel ("OGC") issued a letter to FCADV, again seeking "to obtain the required documents."

72.    The November 7, 2019 letter states, in part that:

- 15 -

After careful consideration and deliberation, the Department remains concerned with FCADV's lack of cooperation and transparency regarding the use of state and federal funds for executive level salaries. Simply, based on FCADV's inadequate responses, many questions remain unanswered.

73.   The November 7, 2019 letter states, in part that:

**A. FCADV Contractual Duties**

…Section 5.1.5 of the Contract requires FCADV to comply and cooperate immediately with any inspections, reviews, investigations, or audits deemed necessary by the OIG.

Section 5.1.6 of the Contract states that no record may be withheld nor may FCADV limit the scope of the foregoing inspections based on any claim that any record is exempt from public inspection or is confidential, proprietary, or trade secret in nature.

74.   The November 7, 2019 letter states, in part that:

The Department has grave concerns regarding the failure of FCADV to sufficiently comply with the Inspector General's repeated requests for satisfactory documentation and information regarding executive level salaries and funding sources.

**C. FCADV Needs to Provide Transparency on Their Use of State and Federal Funds**

FCADV did not provide sufficient information and documentation in response to the OIG letters dated August 27, 2018, January 31, 2019, and September 11, 2019. The Department hereby requires that FCADV respond to the numbered items below no later than November 22, 2019.

1. If $137,562 of the President/CEO/Executive Director's compensation was from Family Violence Prevention and Services Act (FVPSA) funding, indicate how much of the $623,998 balance (see table) is from state-appropriated funds.

| Compensation Sources | All Sources | FCADV Only |
|---|---|---|
| FCADV | $ 761,560 | $ 761,560 |
| FCADV and related organizations | 40,050 | 0 |
| SubTotal | $ 801,610 | $ 761,560 |

| | | | |
|---|---|---:|---:|
| | Less: FVPSA Portion | (137,562) | (137,562) |
| | | $ | $ |
| | Total | 664,048 | 623,998 |

75.    The November 7, 2019 letter states, in part that

The Department demands accountability and transparency of all providers, particularly those dealing with life and death matters. The Department expects and anticipates enhanced cooperation in its duty to achieve accountability and transparency from FCADV. The Department looks forward to FCADV's comprehensive response.

76.    A true and correct copy of the DCF's November 7, 2019 letter to Karen Walker, who was at that time an attorney for FCADV, is attached as Exhibit 10.

77.    At paragraph 29, the DCF Lawsuit alleges a "meeting occurred as a result of OGC's November 7, 2019, demand to finally review records intentionally withheld by FCADV, despite nearly 2 years of requests for production pursuant to the contract."

78.    By email dated January 31, 2020, DCF requested FCADV provide documents and information that had been as previously requested by its Office on August 27, 201, January 31, 2019, September 11, 2019 and November 7, 2019.

79.    A true and correct copy of the DCF's January 31, 2020 email to FCADV's counsel Karen Walker is attached as Exhibit 11.

80.    Through its investigation, DCF determined that Carr had received millions of dollars in salary, bonuses and PTO.

81.    A month after DCF's email dated January 31, 2020, DCF filed the DCF Lawsuit.

82.    At paragraph 35, the DCF Lawsuit alleges that INSUREDS "engaged in a scheme and conspiracy to provide false and misleading information and documents to DCF and OIG regarding Ms. Carr's total compensation, and FCADV's use of public funds."

83.   At paragraph 36, the DCF Lawsuit alleges on information and belief, "each had respective personal stakes in the aforementioned scheme and conspiracy, separate and apart from those of FCADV, as they each received a number of personal benefits, including, but not limited to, increased salaries, compensation, bonuses, and PTO."

**2.   The AG Lawsuit**

84.   On or about March 4, 2020, the Florida Attorney General filed the AG Lawsuit against two of the INSUREDS, FCADV and Carr.

85.   A true and correct copy of the AG Lawsuit is attached as Exhibit 12.

86.   Like the prior written demands and the DCF Lawsuit, the AG Lawsuit directly relates to the alleged excessive compensation (*i.e.*, salary, bonuses and PTO) received by Carr as CEO of FCADV.

87.   At paragraphs 25 and 26, the AG Lawsuit alleges "during the 40-month period from July 1, 2016 through October 2019, Ms. Carr received compensation – including wages, bonuses, paid time off ('PTO') liquidations, and car allowances – totaling $7,514,748.48. Of that, PTO payouts totaled $3,707,866.21. Inclusion of retirement and insurance benefits for her brings the total value of her compensation package for that same period to $7,762,573.27," and that "FCADV and Ms. Carr used PTO as a means of surreptitiously awarding what in substance amounted to bonuses for Ms. Carr, as CEO."

88.   At paragraph 33, the AG Lawsuit alleges: "DCF has made efforts from 2018 forward to obtain all pertinent records of FCADV from it, but FCADV has engaged in a campaign of stonewalling by which it has resisted producing requested records. While FCADV has slowly been turning over its records to DCF, many of its records have contained redactions.

To date, upon information and belief, FCADV still has not fully complied with DCF's requests for records."

**D.**     **Application of the Policy Terms and Exclusions**

**1.**     **The Prior & Pending Litigation/Demand Exclusion**

89.     The Prior & Pending Litigation/Demand Exclusion states in part that, "[t]his insurance does not apply to **Loss** for any **Claim** [*i.e.*, the State Litigation]:…[b]ased upon, arising out of or in any way related to any…litigation…written demand pending against any **Insured**…prior to [December 18, 2019]."

90.     At paragraph 54, the DCF Lawsuit alleges, "On June 20, 2013, DCF and FCADV entered into a valid and enforceable contract. *See* Exhibit 'B.' On July 31, 2019, the parties thereto entered into a subsequent valid and enforceable contract. *See* Exhibit 'A.'"

91.     At paragraph 18, the DCF Lawsuit alleges "Contract LJ990" is a contract between DCF and FCADV.

92.     As used in "Contract LJ990," the term "Department" means the Florida Department of Children and Families, and the term "Provider" means the Florida Coalition Against Domestic Violence, Inc.

93.     At paragraph 18, the DCF Lawsuit alleges "Contract LN967" is a contract between DCF and FCADV.

94.     As used in "Contract LN967," the term "Department" means the Florida Department of Children and Families, and the term "Provider" means the Florida Coalition Against Domestic Violence, Inc.

95.     Section 25.a. of Contract LN967 provides:

The Provider shall establish and maintain book, records and documents (including electronic storage media) sufficient to reflect all income and expenditures of funds by the Department under this Contract.

96.   Section 25.c. of Contract LN967 provides:

Upon demand, at no additional cost to the Department, the Provider will facilitate the duplication and transfer of any records or documents during the term of this Contract and the required retention period in Section 25.b.

97.   Section 5.1.1 of Contract LJ990 provides:

The Provider shall establish and maintain book, records and documents (including electronic storage media) sufficient to reflect all income and expenditures of funds by the Department under this Contract.  Upon demand, at no additional cost to the Department, the Provider will facilitate the duplication and transfer of any records or documents during the term of this Contract and the required retention period in Section 5.1.2. These records shall be made available at all reasonable times for inspection, review, copying, or audit by Federal, State, or other personnel duly authorized by the Department.

98.   DCF, or its representatives, sent correspondence to FCADV dated August 27, 2018, August 31, 2018, January 31, 2019, September 11, 2019, November 7, 2019, and January 31, 2020.

99.   At paragraph 22, the DCF Lawsuit alleges, "[d]espite its contractual obligations, FCADV repeatedly and continuously failed and refused to comply with, and breached, Contracts LN967 and LJ990, including, but not limited to, by:

    a.   Violating State and Federal statutes, rules, regulations and policies;

    b.   Failing to advise of legal actions taken against FCADV;

    c.   Failing to maintain and provide adequate financial records;

    d.   Failing to comply with inspections, reviews, investigations or audits deemed necessary by the DCF Office of the Inspector General (OIG);

    e.   Using State and Federal funds for a prohibited purpose — Lobbying;

    f.  Violating the Federal Funding Accountability and Transparency Act; and

    g.  Violating of applicable public records and Sunshine laws.

100.   At paragraph 48, the DCF Lawsuit alleges, "DCF, through both its OIG and OGC, made repeated and multiple demands for production of documents reflecting the income and expenditure of funds provided by DCF."

101.   The State Litigation is "based upon, arising out of or in any way related to" the DCF Investigation, and its five written demands for documents and/or information to FCADV prior to December 19, 2019, and therefore, the Prior & Pending Litigation/Demand Exclusion bars coverage for the State Litigation.

### 2.   The Policy Application Claim Exclusion

102.   Section IX of the Hanover Policy Application asked, "[i]s the **Insured** proposed for coverage aware of any fact, circumstance, or situation that might reasonably be expected to result in a **Claim** that would fall within the scope of the proposed **Liability Coverage Parts**?"

103.   FCADV answered "no" to this question.

104.   Prior to execution of the Policy Application, the INSUREDS were aware of the DCF Investigation, including the written demands to FCADV seeking information and documents related to Carr's and other executives' compensation.

105.   The answer "no" to the question posed in Section IX was not a truthful answer.

106.   Given the Policy Application Claim Exclusion provides that: "the Applicant understands and agrees that if any such fact, circumstance or situation exists, whether or not disclosed in response to the question above, any claim or action arising from such fact,

circumstance or situation is excluded from coverage under the proposed policy, if issued by the **Insurer**," there is no coverage under the Policy for the State Litigation.

### 3.    The Policy Claim Exclusion

107.   In Section XIV, the Policy Claim Exclusion provides if the **Application** contains any misrepresentations made with the intent to deceive or contains misrepresentations which materially affect the acceptance of the risk or the hazard assumed by the **Insurer** under this Policy, then "no coverage shall be afforded for any **Claim** based upon, arising from, or in consequence of, any such misrepresentation with respect to" any **Insured** "who knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations)."

108.   Prior to execution of the Policy Application, the INSUREDS were aware of the DCF Investigation, including written demands to FCADV seeking information and documents related to Carr's and other executives' compensation, and its answer "no" to Section IX was not a truthful answer.

109.   This misrepresentation, known by the INSUREDS, was made with the intent to deceive or contains misrepresentations which materially affect the acceptance of the risk or the hazard assumed by the **Insurer** under this Policy, such that the Policy Claim Exclusion applies to any **Insured** "who knew of such misrepresentations (whether or not such individual knew such **Application** contained such misrepresentations)."

### 4.    The Fraud Exclusion

110.   The Fraud Exclusion in the Policy states in part that, "[t]his insurance does not apply to **Loss** for any **Claim**:…Based upon, arising out of or in any way related to: …Any

deliberate, dishonest, fraudulent act or omission, or willful violation of any statute or regulation by an **Insured**."

111.   The State Litigation contains alleges of fraud.

112.   For example, the DCF Lawsuit alleges causes of action for "Fraudulent Concealment," "Fraudulent Misrepresentation," and "Civil Conspiracy" (based on "an agreement to engage in fraudulent concealment and fraudulent misrepresentation of material facts," as well as direct allegations of "deliberate, dishonest, fraudulent act or omission," and/or "willful violation of any statute or regulation by an **Insured**," such that the Fraud Exclusion is applicable.

### 5.   The Profit Exclusion

113.   The Profit Exclusion in the Policy expressly states that, "[t]his insurance does not apply to **Loss** for any **Claim**:…[b]ased upon, arising out of or in any way related to:…[a]n **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled." (Hanover Policy; Ex.1, D&O Coverage, Section IV.A.3.b.)

114.   The State Litigation contains allegations of improper profiteering.

115.   Count III of the AG Lawsuit (Ex. 12) is for "**Disgorgement of Profits**," and alleges "[t]his is an action by the Florida Department of Legal Affairs, pursuant to Section 617.2003, Florida Statutes, to recover on behalf of FCADV profits improperly received by Defendant Tiffany Carr due to her breach of fiduciary duty", and that "the OAG respectfully requests that judgment be entered against Tiffany Carr requiring that she disgorge all profits of FCADV received by her over at least the past five years, whether in the form of salary or bonus

or PTO or otherwise, that were not properly earned by her and not properly authorized to be paid to her by FCADV's Board of Directors".

116.  The DCF Lawsuit (Ex. 2) alleges, "[t]his funding was provided for the public purpose of coordinating and administering statewide activities related to the prevention of domestic violence, not for the FCADV board to award exorbitant salaries, bonuses, and PTO, to Ms. Carr, in exchange for personal gain," and that "Ms. Carr, Ms. Barnett, Ms. Duarte, Ms. Keeth, Ms. Lynch, Ms. Diaz, Ms. Riffey, Ms. Fagan, Ms. Beachy, Ms. Schwab, Ms. Taylor, and/or Ms. Morrill engaged in a scheme and conspiracy to provide false and misleading information and documents to DCF and OIG regarding Ms. Carr's total compensation, and FCADV's use of public funds. Upon information and belief, Ms. Carr, Ms. Barnett, Ms. Duarte, Ms. Keeth, Ms. Lynch, Ms. Diaz, Ms. Riffey, Ms. Fagan, Ms. Beachy, Ms. Schwab, Ms. Taylor, and/or Ms. Morrill each had respective personal stakes in the aforementioned scheme and conspiracy, separate and apart from those of FCADV, as they each received a number of personal benefits, including, but not limited to, increased salaries, compensation, bonuses, and PTO."

117.  The State Litigation is "[b]ased upon, arising out of or in any way related to:…[a]n **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled," such that the Profit Exclusion is applicable.

### 6.     **The Contract Exclusion**

118.  The Contract Exclusion in the Policy states in part that, with respect to coverage for FCADV, "[t]his insurance does not apply to **Loss** for any **Claim**:…[b]ased upon, arising

out of or in any way related to liability…on account of, any oral or written contract or agreement to which an **Insured** is a party."

119.   The DCF Lawsuit contains causes of action against FCADV for "Breach of Contract" ( "Breach of the Implied Duty of Good Faith and Fair Dealing" and "Breach of Fiduciary Duty" and avers that "FCADV owes fiduciary duty to DCF, as it was statutorily and contractually placed in a position of extreme trust," and, therefore, the State Litigation is based upon, arising out of or in any way related to liability on account of, any oral or written contract or agreement to which an Insured is a party.

### 7.   Uninsurable As A Matter of Law

120.   The Policy provides that "**Loss**" does not include any amount deemed uninsurable by law.

121.   The State Litigation seeks recovery solely of amounts that are restitution, disgorgement and/or the return of ill-gotten gains of improperly paid wages, bonuses and PTO.  Under Florida law, restitution, disgorgement, and the return of ill-gotten gains is not "**Loss**" (including **Defense Expenses**) and is uninsurable as a matter of law.

### 8.   The Known Loss Doctrine

122.   Under Florida law and the Known Loss Doctrine, there is no coverage under the Policy because the INSUREDS knew at the time it applied for coverage with Hanover that a claim or injury already occurred prior to seeking coverage.

123.   When FCADV submitted its Policy Application seeking coverage, the INSUREDS knew or should have reasonably known that: (i) Carr and other executives at FCADV had misappropriated of millions of dollars in grant monies for their own personal

benefit; and/or (ii) that DCF had made no less than five written demands for documents pursuant to the DCF Investigation – and that a claim or injury had already occurred.

### COUNT I – Declaratory Judgment Regarding Hanover's Duty to Defend

124. Hanover incorporates and restates each and every foregoing allegation as if fully set forth herein.

125. Based upon any or all of the terms and exclusions of the Policy identified herein, and/or based on Florida law, Hanover has no duty to defend the INSUREDS for the allegations contained in the State Litigation.

WHEREFORE, Hanover respectfully requests that this Court enter judgment in Hanover's favor and against the INSUREDS, declaring that Policy provisions preclude coverage for the State Litigation, and that Hanover has no duty to defend the INSUREDS from the allegations made in the State Litigation, and that Hanover can recover all of its **Defense Costs** it has paid to the INSUREDS, and that this Court to grant Hanover such other and further relief as this Court deems just and equitable under the circumstances.

### COUNT II – Declaratory Judgment: Hanover Can Recoup "Defense Costs" Paid

126. Hanover incorporates and restates each and every foregoing allegation as if fully set forth herein.

127. Based on Count II, if this Court determines that Hanover had no obligation to defend the INSUREDS in either one of the lawsuits that comprise the State Litigation, then under Florida law, Hanover is entitled to recoup severally from the INSUREDS the amount of Defense Costs Hanover has paid related to the State Litigation.

WHEREFORE, Hanover respectfully requests that this Court enter judgment in Hanover's favor and against the INSUREDS, declaring that Policy provisions preclude coverage for the State Litigation, and that Hanover has no duty to defend the INSUREDS from the allegations made in the State Litigation, and that Hanover can recover all of its **Defense Costs** it has paid to the INSUREDS, and that this Court to grant Hanover such other and further relief as this Court deems just and equitable under the circumstances.

## **COUNT III – Declaratory Judgment Regarding Hanover's Duty to Indemnify**

128.   Hanover incorporates and restates each and every foregoing allegation as if fully set forth herein.

129.   Based upon any or all of the terms, conditions and exclusions of the Policy identified herein, Hanover has no duty to indemnify the INSUREDS from any **Loss** (*e.g.*, damages, judgments or settlements) related to the State Litigation.

WHEREFORE, Hanover respectfully requests that this Court enter judgment in Hanover's favor and against the INSUREDS, declaring that Policy provisions preclude coverage for the State Litigation, that Hanover has no duty to indemnify the INSUREDS for any "**Loss**" related to the State Litigation, and that this Court to grant Hanover such other and further relief as this Court deems just and equitable under the circumstances.

March 20, 2020

Respectfully submitted,

By: /s/ Sean M. McDonough
SEAN M. McDONOUGH, ESQUIRE
Florida Bar No. 896446
sean.mcdonough@wilsonelser.com

Wilson Elser Moskowitz Edelman & Dicker LLP
111 North Orange Avenue Suite 1200
Orlando, Florida 32801
407-203-7599 - Phone
407-648-1376 - Facsimile
Attorneys for Plaintiff, Hanover Insurance Company

SMM:ajc